**Duffy Estate**

*Catherine R. Barone, Michael von Moschzisker* and *Israel Packel,* Attorney General, for Commonwealth.

*Robert G. Hess,* of *Howland & Hess,* for appellant.

SHOYER, J., June 25, 1974.—Following the filing of petition and answer, a hearing was held on the inheritance tax appeal of Richard B. Conlan.

After the death of Alma M. Duffy on November 6, 1971, an inventory of the safe deposit box registered in the joint names of Richard B. Conlan and Alma M. Duffy, made by the Department of Revenue as required by statute, revealed that the box contained, among other assets, a number of United States Savings Bonds, Series E, with a cash surrender value of $27,261.58, as of the date of death of Alma M. Duffy. These bonds were registered in the joint names of "Richard B. Conlan or Alma M. Duffy." Consequently, the Commonwealth, Department of Revenue, assessed Pennsylvania Inheritance Tax against one-half of the market value of these bonds, recognizing that the bonds had been purchased by the survivor but on the theory that the deceased joint tenant had had access to the box as one of the two joint owners of said box. The taxpayer has appealed from the tax assessment and his appeal is now before the court.

The uncontradicted testimony of Richard B. Conlan, the appellant and brother of decedent, at a hearing before this court on February 26, 1974, established that he has been employed by Betz Laboratories, a Pennsylvania corporation, as engineer for the past 32 years; that during the course of that employment he chose to purchase certain Series "E" savings bonds through a payroll deduction plan established by his employer; that he instructed the employer to purchase bonds on his behalf in his name, "payable on death" or "P.O.D." to his sister, the decedent; that the em-

ployer, in fact, did purchase at least three such bonds in the name of appellant payable on his death to his sister, but, subsequently, without any further or different instruction from appellant, purchased all of the bonds involved in this appeal in the name of appellant "or" decedent.

It further appeared in the testimony of appellant that the safe deposit box in which the bonds were kept, although registered in the names of appellant and decedent, was, in fact, used to keep only the property of appellant (except for some jointly registered A. T. & T. stock which he and his two sisters had inherited from their mother); that the two keys to the box were always in the possession of appellant who kept them in his bureau drawer; that decedent entered the safe deposit box on only one occasion from the date on which it was rented in 1957 until the time of her death; and that the purpose of that entry was to place property of appellant in the box at his request; that appellant placed his accumulated bonds, still in their brown envelopes, in the box every three or six months; and that decedent had another box in the same branch of the same bank, in her name and the name of her husband, in which she kept her own property and the property of her husband; and that decedent's name appeared as a co-owner of appellant's box as a matter of convenience only.

In addition, appellant testified that he is unmarried; that he has one other sister, Frances Conlan, with whom he resides and who is also unmarried; that decedent lived in a home next door to appellant's residence, with her husband; that decedent had two daughters who are, therefore, appellant's only two nieces; that decedent was three years older than appellant and in poor health for at least ten years prior to her death, having been hospitalized on three occasions

during that ten-year period for serious ailments; and finally that it was not his intention at any time to make a present gift to decedent during her lifetime, but only to provide for her in the event of his prior death.

In fact, it appears that on one occasion, appellant loaned money to decedent and her husband for repairs to their house which he obtained by personally cashing bonds with a total value of approximately $3,300, which sum the husband of decedent was repaying at the time of her death by depositing regular amounts in a bank account at Philadelphia Savings Fund Society which he had opened in the name of appellant. Appellant testified that he reported the entire interest earned on the cash surrendered bonds on his own personal income tax return.

At a later hearing held April 25, 1974, Tillie Pancoast, a 40-year employe of appellant's employer, who was one of three girls whose duties included the clerical work involved in conducting the payroll deduction plan for the purchase of bonds, testified that the company was small when appellant purchased his first bond in 1952; that all payroll records were kept by hand; that the initial card used to set up a payroll deduction plan for each participating employe was filled out by the witness or some other office personnel and not by the employe; that changes were made in an informal manner, frequently on the telephone; and that the employe's signature was neither obtained nor required either to set up an account in the beginning or to change it later on.

Mrs. Pancoast testified that, over the years, the company has grown substantially in size, so that in 1971, a computerized system was installed, employes are now required to sign applications and change

authorizations, and nothing is any longer done by hand.

After examining the office records pertaining to appellant, which are before the court, this witness expressed the opinion that the only writing thereon was that of a Miss Schwab, who used to be in the payroll department and is now deceased; that she had no present recollection of any of the information it contained, and could not account for the fact that both co-owner and P.O.D. beneficiary blocks on the initial card were checked, unless it had something to do with a bank recommendation that all bonds should be issued in two names so that someone would be available to cash a bond in case of need during an illness.

In this latter regard, Mrs. Pancoast was quite emphatic in asserting that the bank from which the company purchased the bonds recommended that they be issued in two names; that the girls in the payroll department who administered the plan urged employes to so register their bonds; and stated that she herself, after 40 years in the payroll department, was not aware of the tax consequences of a joint registration until she was so advised by counsel for appellant shortly before the hearing at which she testified.

Taxation of jointly held property is controlled by the provisions of the Pennsylvania Inheritance and Estate Tax Act of 1961, June 15, 1961, P. L. 373, 72 PS §§2485-101, et seq. Section 241 imposes a tax on joint tenancy interests in the following language:

"When any property is held in the names of two or more persons, or is deposited in a financial institution in the names of two or more persons, so that, upon the death of one of them, the survivor or survivors have a right to the immediate ownership or possession and enjoyment of the whole property, the accrual of

such right, upon the death of one of them, shall be deemed a transfer subject to tax under this act, of a fractional portion of such property to be determined by dividing the value of the whole property by the number of joint tenants in existence immediately preceding the death of the deceased joint tenant."

Our Supreme Court in the recent case of Olson Estate, 447 Pa. 483, 486, 487 (1972), construed section 241 in a case involving joint savings accounts, and said:

"Section 241 in clear and specific language imposes a tax on a joint account with a right of survivorship, upon the death of one of the joint tenants. The enhanced 'right to the immediate ownership or possession and enjoyment of the whole property' thus accruing to the survivor is deemed a statutory transfer subject to tax.

"In Cochrane's Estate, 342 Pa. 108, 20 A. 2d 305 (1941), where we sustained the constitutionality of the practically identical predecessor of Section 241, we observed: 'What is actually acquired by the surviving joint tenant upon the death of the co-tenant is the right to the immediate ownership, possession and enjoyment of the whole property and *it is the accrual of this right which the statute properly taxes . . . . Even where one contributes the entire sum to a joint bank account, the rights of each of the tenants to the joint fund are the same. . . .* Hence what one tenant acquires on the death of the other, where there are two joint tenants, as here, is the *right to the immediate possession, ownership and enjoyment of the entire* fund and not, as viewed by appellant, the contribution of the deceased joint tenant.' . . . Commonwealth v. Nolan's Estate, 345 Pa. 98, 100-01, 26 A. 2d 308, 310 (1942).

"The Commonwealth having established the existence of these joint accounts with the right of survivorship, its claim to the tax could only be defeated by clear and convincing proof that the accounts were created as a result of fraud, accident or mistake."

Here, the Commonwealth recognizes in its brief that its claim for tax on the bonds purchased by Richard Conlan can be defeated if the court finds that there is clear and convincing proof that the "or" registration was placed on the bonds "as a result of fraud, accident or mistake."

As to his sister's name on the safe deposit box, Richard Conlan testified (t. 11):

"Q. Explain why you put your sister's name on that box?

"A. For convenience, really. It was not always accessible to me with my working conditions.

"Q. You mean during banking hours?

"A. During banking hours.

"Q. Was your sister available during banking hours?

"A. Yes.

"Q. How far is the bank from your homes?

"A. One block."

As to the registration of the bonds following the issuance of the first three which were "P.O.D. Alma M. Duffy," appellant testified:

"Q. Why was the registration changed?

"A. *I have no idea.*

"Q. What instructions did you give to your employer with regard to the change?

"A. *I gave them no instructions as to a change.*"

As to whether or not appellant was aware of the change in registration prior to the death of his sister, Alma, especially as to the bonds which he cashed in

order to provide a loan for his sister and brother-in-law in repairing their property, the following occurred on cross-examination:

"Q. You certainly knew how those bonds were registered.

"A. Yes, but I didn't know the importance of this P.O.D. or "either/or" thing. I was not conscious of that at all.

"Q. It was your intent if you died you fully intended your sister, Alma, get all these bonds?

"A. Yes, hoping the others would also share. ...

"Q. Actually, when you got the bonds you looked at the bonds, didn't you?

"A. I don't know whether I did or not, really. These things came so automatically it was just like a paycheck. You don't really look at the face of it.

"Q. But you did look at the bonds when you took them to the bank later on to redeem them?

"A. Yes.

"Q. The cashier of the bank or someone asked you how they were registered and at that time you looked at the bonds?

"A. Yes, but I thought they were my bonds and therefore I had the right to sell them if I wanted to. The only bonds that were cashed were cashed at a branch of Girard which was near our offices at the time the Torresdale Avenue Branch, and Mr. Irvin was the man there that I knew.

"Q. But when you cashed them you were cognizant how the bonds read that were cashed?

"A. I don't know whether I really was. I just signed my signature to them. It didn't require anyone else's signature."

On re-direct examination appellant testified as follows:

"Q. When you initially signed up under the payroll deduction plan, was the P.O.D. explained to you?

"A. I don't believe it was fully explained. In fact, I wasn't conscious of these things until this business came up in the last two years or so.

"Q. But did you explain your intention to your employer?

"A. Oh, yes. It was probably suggested that I have these in the joint names of someone else other than myself, and I think it was Miss Schwab that did that. We were a very small outfit then. It was more or less like a family outfit.

"Q. After your initial conversation with Miss Schwab following which three bonds were issued in your name P.O.D. your sister, did you have any other conversation with her regarding a change?

"A. *No.*"

And then again, on page 27 of the notes of testimony, appellant when questioned by the court stated, "I assumed these were mine because I went and cashed the ones that I did cash with no difficulty at all.

"Q. You're positive you never told your employer to make the change?

"A. *I'm certain of that.*"

Mrs. Pancoast, after examining the card kept by the company, stated that she could not tell whose typing was on it but such handwriting as appeared on the company's records appeared to be that of Miss Schwab. As to the change in former registration she was asked:

"Q. Did you ever advise your employees as a general company policy—

"A. We had been instructed by employees of Girard Trust to have more than one name on a bond simply for the reason that if a person needed money and they were sick and in bed, no one could cash the

bond, so they always suggested that we have two names on them.

"Q. Had representatives of the bank personally made this suggestion to you?

"A. Yes, and we passed it on to everyone."

She further stated:

"Q. Under the present system when a change is made, does that require a signed authorization?

"A. Yes. You have to send a notice in.

"Q. Under the old system under which Mr. Conlan operated, was there any document he was required to sign?

"A. Not particularly. It was a small company and a phone call would do. Many of them would call and change the size of the bond or their address, or the method of paying, or something."

While the witness did not claim to have worked on this particular card, upon examining it she testified:

"The beneficiary is definitely crossed out and the co-owner is emphasized."

When asked on cross-examination if Mr. Conlan ever objected to the way the bonds were being registered, the witness replied:

"A. I don't believe so. I think he acted under our advice and the bank suggested to have two names on them so the second person could cash them if he were sick and couldn't get to the bank."

Again:

"Q. Does that mean where you had a record for a P. O. D. you would then tell the bond owner that in the event he were sick it would be better to have a co-owner on it rather than P.O.D.?

"A. That was the suggestion of the bank.

"Q. But you still needed his approval before you made a change, didn't you?

"A. I suppose this could have been a telephone call or something.

"Q. But that would have been his approval, wouldn't it?

"A. Yes."

In the opinion of the trier of fact, the testimony, when carefully analyzed, boils down to this. Mrs. Pancoast says it was the company's rule to require approval before any change in registration was made, but Mr. Conlan says most emphatically that he never gave any order for, nor any approval of, the change. Mrs. Pancoast does not contradict appellant by insisting that he *did* request the change, or even that he *must* have requested the change. She has merely stated the rule which, of course, leaves room for a margin of error or a *mistake* in the absence of any required signature or written authorization.

We thus have a clear statement by appellant that the only reason his sister's name was on the bonds was in order that she could have them in the event of his death. He always treated them as his own, never as being jointly owned with her despite the obvious "or" registration placed on all bonds after the first three were issued in the P. O. D. form. Clearly, then, we have in this case a *mistake*. The Commonwealth would argue that such mistake as exists is a mistake of law and, hence, appellant must suffer the consequences of his legal ignorance. The solution to such a problem is never easy, and our Supreme Court, recognizing the difficulty in Kunkel v. Kunkel, 267 Pa. 163, 172 (1920), commented that even legal giants reputed to know *all* the law might sometimes err because, "Even good Homer sometimes nodded."

The Commonwealth relies on Olson Est., supra, and argues that even if this was a mistake by the company,

appellant must be held to have acquiesced because of the long period of time over which these bonds were issued. Such contention ignores appellant's individual action in cashing the bonds for his sister's loan and the personal conviction that they were his alone which this experience strengthened. In Olson, the two co-owners of the savings accounts had both signed the bank's cards which provided that they held the funds as "joint tenants with right of survivorship and not as tenants in common." Here, nothing was signed at any time by appellant, nor was anything placed before him to read before signing.

The record is clear that appellant never sought nor requested the change in registration which was made. Appellant's testimony was frank, forthright and free from contradiction, conflict and confusion of any kind. It had the ring of truth and the hearing judge finds it fully credible. The hearing judge finds the quality of appellant's evidence as to the existence of a mistake to be clear, precise and convincing. There is no proof that appellant ever authorized the change, and even under the Commonwealth's theory it could only have been on the assurance that it was a change desired by the bank for his convenience, and his convenience alone, and not to change the effects of the original registration in any other respect whatsoever.

Counsel for appellant cites Myers Estate, 359 Pa. 577 (1948), where a decedent had purchased bonds which he registered jointly with his sister and then placed them in a safe deposit box owned jointly by decedent and his mother. Our Supreme Court held that there was no delivery of the bonds to the surviving sister, since she had no access to them until decedent's death, and, therefore, the bonds were fully taxable. In his opinion, Chief Justice Maxey pointedly stated, page 582:

"To permit a transfer inheritance tax exemption on all government bonds issued in co-ownership form, *without examining the circumstances of each case,* would encourage the practice of investing one's estate in such bonds and registering them in joint names for the purpose of circumventing the payment of a legitimate exaction." (Italics supplied.)

In Beggy Estate, 446 Pa. 166 (1971), where the bonds were registered jointly in the name of decedent and his brother, and kept in a safe deposit box owned by decedent alone, our Supreme Court held them fully taxable because the surviving brother had no right to possession prior to decedent's death. The majority holding of our Supreme Court in this case is especially significant because it was rendered after a finding by the trial judge that the survivor had contributed at least one-half the cost of the bonds. Recognizing this fact, the majority, nevertheless, held that "the transfer of ownership in the bonds took place only after decedent's death; upon such transfer, the Commonwealth properly placed a tax based on the full value of the bonds." Physical delivery or the right to possession is thus judicially superimposed upon joint registration as the basis for taxability under section 241.

In Monheim Estate, 451 Pa. 489 (1973), our Supreme Court held that the critical factor in determining whether transfer inheritance tax should be applied to the entire value of the bonds or only to half of such value is whether the joint tenants had equal rights to the possession, ownership and enjoyment of the bonds prior to the death of the one joint tenant. And that where a co-owner is able to prove such access through a qualified agent, he has a present, unrestricted and immediate right of possession so that tax liability is limited to one-half the value of the bonds. In both Beggy and Monheim, the court quoted and fol-

lowed the cautionary advice of Myers to carefully examine "the circumstances in each case."

These cases by our Supreme Court construing section 241 suggest the following syllogism. Upon the death of one co-owner the assessment under section 241 is:

100 percent tax where donor dies without completing the gift;

50 percent tax where donor dies after completing the gift; therefore.

NO TAX where donor survives without completing the gift.

The tax collector should not have it both ways. The major premise and the minor premise as stated in the above syllogism are clearly established by our Supreme Court decisions. Therefore, the conclusion of no tax in the present case does logically and fairly result. The lower courts in Driscoll Est., 50 Erie 61, 17 Fiduc. Rep. 439 (1967), and Oliver Est., 71 Lack. Jur. 168, 21 Fiduc. Rep. 43 (1970), followed the legal principle of the above syllogism and held the bonds in each case to be nontaxable. Here, in addition, we have the "clear and convincing proof" mandated by Olson that the "or" registration was created as the "result of . . . mistake."

The hearing judge, therefore, upon careful consideration and reconsideration of all the evidence in this case makes the following findings of fact:

1. Appellant kept possession of both keys to the safe deposit box in his bureau drawer and permitted decedent to enter the box on only one occasion in 15 years.

2. Decedent had no access to the box except with the express consent of appellant and as his agent.

3. Appellant was younger than decedent and in good health, while decedent was in very poor health, having been hospitalized three times in recent years for various circulatory ailments.

4. The first three bonds purchased by appellant were registered "Payable on Death" to decedent, and bonds thereafter issued jointly, although appellant did not direct nor authorize such change and never consciously acquiesced in the same.

5. It was the custom of the employer for over 40 years on the advice of its bank to urge employes to place two names on each bond so that, in case of sickness, the bonds could be cashed for the owner.

6. At the time the registration was changed to co-ownership on these bonds, the employer was a small operation in which the small number of employes were well known to each other and did business informally, sometimes over the telephone, and furthermore no signature or written authorization was required to order these bonds in the first instance or to subsequently make changes in the registration.

7. Appellant loaned money to decedent by personally cashing a number of the jointly held bonds which decedent repaid by causing regular deposits to be made in a bank account which she caused to be opened in the name of appellant alone.

8. Appellant paid income tax on the interest realized on the bonds which he cashed in order to lend money to decedent.

9. The change in the registration of the bonds from "P. O. D." to "or" bonds was made by a mistake of the employer.

The hearing judge, therefore, concludes as a matter of law:

1. Decedent, prior to her death, never had any right to the possession, ownership or enjoyment of these bonds, either wholly or in part.

2. Since decedent's name was placed on these bonds as co-owner as the result of a mistake by appellant's employer, these bonds have always remained as a matter

of law the bonds of the appellant and, therefore, are not subject to inheritance tax under section 241.

Wherefore, the appeal is sustained and the court now enters the following

## DECREE

And now, June 25, 1974, the appeal from the inheritance tax appraisement is sustained; the appraisement is modified as above, and the record is remitted to the Register of Wills.

---

NOTE: Exceptions taken by the Commonwealth of Pennsylvania were subsequently withdrawn.